Please be seated. Before we get on the topic, it's 2-18-205-6. Manningham Tractor Parts, Inc. v. Caterpillar Logistics Services, Inc. On behalf of Manningham, Mr. Collins and Mr. Dunn. On behalf of Manningham, Mr. Dunn. Good morning, and greetings. Mr. Dunn. Good morning. Good morning. May it please the Court. Colin Dunn on behalf of the plaintiff of National Tractor Parts. The issue before the Court is whether or not the Circuit Court erred in granting summary judgment on our Trade Secret Act claim based on a limited record before it. If the answer to that question is no, then the question becomes, did the Circuit Court err in so limiting the record by denying our request for discovery prior to responding to the motion, as well as striking various aspects of the affidavits that we filed in opposition to the motion. Looking at the Trade Secret Act claim, and looking at the order that the Court wrote, it's clear that the Court erred in analyzing what a trade secret is. The first problem was that the Court did not cite or apply the statutory definition of a trade secret. The Capsonic case. And if you compare the two definitions, you can see that the Axe definition is much broader than what the Court relied upon as well. How is it broader? Well, in several ways. One is the case lists five things that could be a trade secret.  The statutory definition just says information, and then it gives a non-exhaustive list of what can be a trade secret. What was the trade secret here? In this case, it was the process that NTP created to perform the subassembly work for Caterpillar and other entities like Caterpillar. And what were the steps taken by your client to protect the trade secret? There were several. So one was that they had these build books and assemblies that they created so that non-skilled labor could perform the work. They locked those in a cabinet under locking key, and only NTP had access to those materials. They had a dedicated workspace that only NTP personnel or persons required for the services were permitted in. Was there any evidence presented that employees of NTP were required to keep the information that they learned secret? Yes. In the affidavits that we provided for both two workers' supervisors as well as Mr. Gunyer, their production manager, they both confirmed that they were instructed and instructed other workers to keep the material secret, to not tell anybody or show anybody about how they did their job. They were too alert. There were supervisors that they saw, non-NTP personnel in the area. Those were all the steps, some of the steps that were taken to protect materials. But they went away from those steps when they went into the Kent Logistics plant and allowed people in and gave the build books away. I don't think that's a fair inference from the emails, Your Honor, with due respect. I think, first of all, it was not a Kent Logistics facility. They leased part of the facility, but it was not their building that they owned. If you look at the emails, you can see that my clients objected when Kent Logistics asked for this information or when they told them that they were putting people or sending people into the area. I'm not sure what more they can do other than resort to self-help, but they can't. They don't have armed guards keeping people out. So they objected, and by the way, the circuit court found that we had presented sufficient evidence, at least to create a tribal fact on whether or not we took sufficient steps to keep this information secret, which is what your question asked. So the court did find, based on the limited record, that we had provided enough information that it was at least a jury question as to whether or not we took sufficient steps. I mean, the main holding by the trial court was that the trade secret that you've been talking about throughout this entire litigation is amorphous. It's just – it's, I wouldn't say illusory, but he couldn't put his finger on it, and he granted three separate motions to compel you to more specifically determine or state what the trade secret was, and when it finally came to the third one being answered, that's when the summary judgment came, and he granted it. And he was still as perplexed at that time as to what the exact trade secret was. Well, two things I'd say. First is this was – there were three different circuit court judges on this case. So the judge that granted – Well, I'm talking about the last judge. I understand. The one that he granted – the judge that granted summary judgment, I don't know that he actually granted any of the motions to compel. Okay. So he was not involved in the discovery, whether or not we had articulated it specifically or not, issues. But that judge, the final judge, I think, didn't understand that you don't have to have some hyper-technical scientific formula for it to be a trade secret. I think you can see that from his order. He thinks that this was too generic. He cited efficiency and cost-effectiveness as what we claimed the trade secret to be, and that's not what we ever claimed it to be. If you look at our interrogatory answers, we articulated that this was a subassembly process. If I had the build books to show you, I could show you. Like exhibit H? That's not a build book. That was what we had in our computer system. But at the time we were performing this work, the computers that had the actual build books in them were confiscated. So what you see there is just remnants of a portion of the build book that NTP had back at the Plano office, but that's not a finalized build book. But let's pretend it is the trade secret. Let's pretend it is the final build book. That's enough. I mean, you're seeing there a picture of caterpillar parts for sure, but it's a picture of how to create, how unskilled laborers could take these parts, piece them together in a fast and efficient way, and create a part that none of us could do that without that information. Well, let me ask you this, though. Under these service agreements, didn't CLI own NTP's assembly processes? No? No. So what would be secret about it if they owned it? Those service agreements did not begin until 2004. NTP had been performing this work for Caterpillar for decades before that. So the process that they created was created long before the 2004 and beyond service agreements that had that language. None of the other purchase agreements that the parties entered into or any other agreements had any similar type of language that said anything you create during the work you do for us is ours. That includes the 2011 service agreement you're referring to as well? 2004 through 2011 all had that language that said if you create confidential information, we own it. We had alleged, and we presented evidence to Mr. Gunyer's affidavit, that the process that led to all these build books and assembly aids had been created long before 2004. What these guys did is say, okay, we need to build a brake system. How do we do this fast and efficiently and correctly? We need to put this part first, put this hose here, screw this in, and they figured out a process to do it. Then they would create these build books. Which would be different with each part, right? Well, it would be different with each assembly. So whether it's a hydraulic main valve, a braking system. Right, so my question is if any build book prepared after 2004 would belong to CAT, right? No, because what would happen is over time the model might change a little bit, but that really wouldn't impact necessarily the braking system or the assemblies that they were building. There may be a hose moved here or a screw moved here, but as Mr. Gunyer explained in his affidavit, these small, what we call de minimis changes, doesn't change the nature of the process that these guys used to figure out how to put this together. The service agreement provided that NTP was to work with CLI to design the subassembly process, correct? The service agreement said that CLI would provide information like that. Our affidavits. I mean, isn't it a reasonable inference that from that, that CLI and NTP were working together and sharing information? I don't know if you ever worked in a factory. Did you ever work in a factory? I have, yeah. So did I. And you're working together. You've got people on site. They're watching what you're doing. It's not being kept secret even though you work for a different company. You're watching what's going on and learning, correct? In our factories, that might have been true. In this situation, that's not the case. There was no collaborative process going on there. But NTP didn't run to court to get a TRO to prevent CLI employees from coming in and working in their workspace while they were observing the work, did they? They did not. And if they wanted to maintain this information and keep it secret, weren't they obligated to take some steps at that point in time to intervene and prevent CLI from getting information? I think it's important to remember, too, that during this time, they were being told, we're going to provide other work, so we're going to continue with you. We're going to find something else for you to do. Is that in the record? It is in the record, yes. It's in the complaint that we've alleged. Yeah, but it's still incumbent upon them to keep their secrets. You can't say, well, I'm hoping to get more work from this person, so therefore I'm going to let them look at my secrets and then later say it's a secret. They shouldn't have looked at it. Because there are e-mails from your client saying, we're going to give you the bill books, and we're allowing you access. I think what more can they do other than object initially? They were sending people without notice. They can go to court. That's true. But here the question is reasonable efforts, reasonable efforts to keep it. And, yes, they could have gone to court at the time, but they were trying to keep this relationship going with Caterpillar because they needed the work. With regard to the desire to depose the CLI employees, what could they have said that you don't already know? Well, I think, number one, they would tell you that what the contract says CLI was to do was not the reality. They would not provide instructions for the workers on how to do the work. The standard work and the standard processes was not something that the workers actually used. I mean, I would have had the two workers testify as to that in the deposition if the CLI employees didn't confirm that. So I think it's important to note, too, that CLI didn't provide any affidavits saying that what the contract says we had the right to do actually happened. And this is not a contract case, as they point out in their briefing. So just because the contract says CLI has the right to provide this information, has the right to collaborate, that doesn't mean that that was the reality of it. And our affidavits say that wasn't the reality, that there wasn't any collaboration going on between the two entities. Well, but that certainly doesn't have a lot to do with the summary judgment. I mean, as far as the main issue that the trial court found, that is, I can't put my finger on your trade secret. And then he made what appears, at least on the face of me, a pretty common-sense ruling, and that is, how could their people, how could CLI's people tell me, the court, what the trade secret is if you can't tell me what the trade secret is? Well, but with respect to the trial court, he did articulate it in the order. He says in the order. Which is the process. Yeah, post-line assembly summarized in the bill. It's alleged to be an actual process by which components are assembled into subassembly, which are later installed by Caterpillar into one of his machines. So he articulates it in the order. I don't know what more we need to prove. Again, this doesn't have to be some hyper-technical scientific formula. It's just information that's sufficient. I know, but I mean, don't you have to be a little more specific than to say it's a process to do something more efficiently? Well, but I'm going to put together something really efficiently, and I've got a process, and therefore it's a secret. Don't you have to say this is the process and this is why it's secret? I mean, it doesn't have to be a little more specificity. I don't believe so. I mean, certainly this is not like a fraud scenario where we have to plead more specificity. But, again, if we add the bill books and assembly, it's the final ones that we're taking. But it's not a pleading issue. It's a summary judgment issue. So the issue is what you've presented so far, have you shown a trade secret? I mean, that's the issue. Not a pleading issue, but a proof issue. Well, but I think the bigger problem for the court was that he didn't see that. All we needed to show for it to be a trade secret are the two elements in the statute, sufficiently secret to derive economic value. He found that we had presented evidence that we were damaged, sufficient evidence to create a tribal effect. That's D-1. D-2 is the subject of efforts that are reasonable under the circumstances to maintain secrets. He found that we had presented sufficient evidence as to that element, too. That was enough to move us along. Well, the case law says, and even after the Act, that you have to show a concrete secret. Does it matter? I don't know what case that you're referring to. I mean, this is the definition from the statute. I know that's the definition, but that's why we have case law. I mean, that's a pretty broad definition. But that's the intent of the legislature. I mean, if the legislature wanted to keep the narrow definition from the common law, it would have kept it. It purposely abrogated those cases and said, here's the new definition. It is a broader definition. You can read it and compare it to the prior common law definition. And based on what was analyzed in this order, it seems to us that there was sufficient evidence to meet both D-1 and D-2. So were there products still in assembly in 2013 that were in assembly pre-2004 that you were using the same process for? I think the answer to that question is yes. And if you looked at even their own spreadsheets, the most that they could say is most of the products weren't being manufactured. And that's, I think, what the trial court relied upon when it found that we had presented sufficient evidence of damages, whatever that number may be, because they couldn't say none of these products were ever created. That's number one. Number two, it goes back to what we argued, which is the minimalist changes in the bill books and assemblies that we might have updated didn't change the nature of the process. Thank you. You'll have time for rebuttal. Thank you. Mr. Pritchett. Good morning, Your Honors. May it please the Court. After years of litigation, multiple court orders, as the Court has observed, compelling NTP to identify its trade secret and to provide evidence of its existence, the best that NTP could do was a set of general principles for setting up an assembly model. And counsel argues that that, what they came up with, complied with the statutory definition. Well, as the circuit court correctly found, general principles such as cost, efficiency, quality, safety, and delivery cannot be a trade secret either under the ITSA or the common law or the restatement factors. But it was information regarding an assembly process, and that seemed to fit the statutory definition, did it not? Well, had they identified something concrete, we acknowledge that a process could be a trade secret under the law. However, NTP hasn't identified any specific process here. They were given multiple opportunities. They had years of litigation. They were compelled, in fact, to provide that information, and all that they could come forward with were these general principles, which now, in their reply brief on page 12, they concede cannot be a trade secret. Well, they also took action. They objected to CLI employees being in the workspace. They objected to CLI taking the bill books. So they took action as well, did they not? Well, Your Honor, respectfully, we don't think that the evidence bears that out. They made an objection based on the morale of their employees. What was happening is that the contract was coming to an end. They had a workforce that was unhappy.  Even when a competitor of NTP was going to be in the work area, the concern wasn't we have a secret process, we have a proprietary process. It was we're worried about the concerns, the morale of our workers, seeing that their jobs are being taken away, which is a legitimate concern, but it doesn't speak to the issue here on appeal or in this case. And so when they objected, again, it was our contracts going away. But as the evidence, the undisputed evidence, their own e-mails show, we are now willingly turning over these materials. We are now allowing unfettered access to the work area, which they were required to do under the services agreement because we had access to their work area, which was in our space, for purposes of the services. And so we think the concession in the reply brief should be the end of the case because the general principles are what NTP identified in its discovery responses. When we said identify and describe your pattern slash process, that's the way the trade secret was described in the pleadings. They no longer have these bill books that they claim are so important to help identify the trade secret. Why wasn't it an abuse of discretion for the trial court to deny NTP's 191B request for discovery since it appears this was a Celotex type motion for summary judgment? Respectfully, Your Honor, it is not accurate to say that they did not have access to the bill books. NTP produced over 1,000 pages of bill books and assembly materials in discovery. In fact, when you look at their discovery responses, Exhibit W to our motion for summary judgment, it's in the record of HC 1556. They say in a sworn discovery response, examples of NTP's patterns processes are depicted in the bill books produced by NTP. And when we asked them, this is Exhibit C, C to our motion for summary judgment, at page C1649 and C1654, we asked for documents sufficient to identify the pattern slash process. C produced bill books. So, Your Honor, respectfully, there were assembly materials, bill books in the discovery record that NTP could have pointed to and said, here's our process. Here's the bill book. Take a look. And they could explain where this process is found, but they don't point to anything. So when we get to the affidavit and request for additional discovery, the judge made a common-sense ruling. It wasn't a Celotex type motion, respectfully. We moved because the affirmative evidence disproved their case. The affirmative evidence of what they identified in discovery as the trade secret, the general principles we showed could not be a trade secret as a matter of law. The affirmative evidence of the services agreements and the materials that they identified in their discovery responses as what we misappropriated, we demonstrated we own those materials by virtue of the services agreement. So whether it's a Celotex motion or not, I think there's a little beside the point because it was a very common-sense reason why the judge denied their discovery. You just mentioned in your answer that you were referring to the services agreement, and actually I had asked opposing counsel whether the material or the trade secret here wasn't owned under the service agreement by CLI, and he answered no, because the processes were developed before the service agreements were entered into. How do you respond to that? Well, again, Your Honor, we don't have any evidence whatsoever of a process. The best that they came up with were general principles that they now conceded don't constitute a trade secret. There is nothing but lawyer argument on this point. There is no evidence of a process. They say they can perform this process for thousands of customers and forecount logistics and dozens of customers afterward. There's nothing in the evidentiary record, the discovery record, to show any kind of process. There's not a single document. So there is absolutely no evidence of a process. And so with respect to the services agreement, I think there's a bit of a— the services agreements were started in 2004. What we demonstrated to the circuit court was that for about half of the materials— so what NTP did is they created two spreadsheets, one for excavators, one for wheelbarrows, and those were the subassemblies initially. And identifying the subassemblies, we said, well, for about half of those, you didn't start making that type of subassembly until after the first services agreement. So, for example, radiators. They didn't make any kind of radiator until 2010. So there's nothing there that could have been predated the services agreement. And so about half of the build books fell under that—in that category. For the other half, or almost the other half of materials, those—the underlying machines, the excavators, the wheelbarrows, didn't exist until after the first services agreement went into effect. So, for example, you couldn't make a build book for a 324D excavator until after 2004 because the 324D excavator didn't exist until after 2004. Well, but aren't they talking about a broader process than just a process for a particular part? Well— I mean, an assembly process. Two responses to that question, Your Honor. First, they have yet to identify what the process is. That's the first step of any trade secrets fund, is to say, this is the concrete process. An assembly line's been around since Henry Ford. They haven't identified anything specific, much less anything secret, about the way they set up an assembly line. So when they say, excuse me, pulse line assembly, that's not a specific type of process? No. A pulse line assembly is an assembly line where each of the components just move down the assembly line. That's what it means. It's pulsed because each component moves at the same time. That's not a trade secret. That's Henry Ford. Actually, it's Ransom Olds. It's what? Ransom Olds invented the assembly line. Henry Ford invented the moving assembly line. Oh, I just forgot. That's okay. I looked it up because as I was reading this case, I was thinking, this looks like an assembly line. Right. I didn't know it off the top of my head. But to your other point, Your Honor, about the process, and this I think gets lost a little bit. So what we demonstrated were for half of the materials, didn't do the components until the services agreement. For most of the other half, the equipment didn't exist until after the first services agreement. They refer to a couple of build books that were created in 1996. We didn't make that equipment after, I think, 2003, 2004. So we're talking about equipment that's been out of production as of 2013, almost a decade. But the point here is that if the build books really did have a process in them, and it is uncontested that we own at least some percentage, at least half if not most, well, then they've disclosed the process to us. Because if you put a process in something that by virtue of the services agreement, CAT Logistics owns, well, then it's not a secret. So, you know, as we go back to this, they had an opportunity to point to the build books and the copies of what we submitted on summary judgment. We're happy to show the court. They've not shown anything secret about the build books. It's a picture of Caterpillar equipment, Caterpillar parts. And, in fact, on summary judgment, we also submitted Caterpillar standard work. Now, as part of the services agreements, and I think this is important, what they say is that CAT Logistics is hiring NTP to provide labor and the supervision of that labor. And the services agreements expressly say that CAT Logistics will provide work instructions, visual aids, work standards. And NTP agrees in the services agreement to perform assembly work in accordance with Caterpillar standard processes. So they've contractually agreed, we're going to perform services according to how you tell us. And their performance, as NTP also agreed, would be judged against their conformance with the Caterpillar standard process. So, essentially, and we put a copy of this process of the Caterpillar standard work into the record. And, as you can see, they're LEGO instructions, step-by-step instructions for putting together, in this case, it was a fuel tank for an 814, 815, 816 series wheel loader. If you compare the two, and I'm happy to show the board, if you compare the two, not only did the standard work contain more information, it contains the same information as the building. And, again, NTP has not taken up its burden and shown how their process is any different than the standard processes they were contractually required to follow as part of the services agreement. So, hey, you know, we talk about this in more of this process, but as we've shown, NTP concedes the general principles, aren't a trade secret. There is no process that NTP identifies at all in discovery, no specific process. When we look at the services agreements, they say, you're supposed to do this work according to our instructions, not your process. And, again, I'll point out the confidentiality provisions in the services agreement all flow one way, in favor of cap logistics. There are no protections for any type of process of NTPs. And when we look at the other record evidence, the places in which you would expect to see some evidence of a process, when the parties are discussing what NTP called a severance package in 2012, when the wheel loaders were being transitioned and the excavators were being transitioned in 2012 and 2013, when NTP put in a bid to continue performing excavator work, all of these times you'd expect NTP to say, well, we've got a process. We have some proprietary secret process they don't say anything about. And as I mentioned before, they say they've employed this process for hundreds of customers before and dozens of customers after cap logistics, and there's no evidence of that application. On the point that counsel raised about the bill books being nearly modified, again, there is no evidence in the record that any of the bill books were simply modified from a previous version of equipment. It's a conclusory affidavit. If you look at the number of components of subassemblies, the bill books that were created, there are hundreds. And so somebody can't just say, well, these were just nearly modified, particularly given the fact that we know that for half of them they couldn't have been modified from something that predated the services agreement because they didn't exist. I mean, they weren't making those subassemblies before the first services agreement. And if you look at the production data, and this is exhibit Z for a motion for summary judgment, you look at the dates of production for these wheelbarrows, these excavators, there are gaps in multiple years. This isn't just next year's car model, right? The 322B excavator was made for a period of time in the 90s. Then CAT stopped making that model. Then they picked up the 324B years later. And so it isn't the case where you're just simply, this is next year's model, we're just doing a tweak. There's no evidence of that. These are entirely different machines, entirely different excavators, entirely different wheelbarrows. And the last point I would make on this is that even if these built boats were merely modified from one to the next, they still fall under the terms of the services agreement because they did not exist in the form they were allegedly misappropriated as they existed in 2013 beforehand. So even if it's just a tweak, even if it's just a minor change, again, there's no actual evidence, they still fall within the provisions of the services agreement. Well, the trial court found there would be an issue of fact on that when ruling on one of the earlier motions. I think it was Judge Krentz, correct? Well, what Judge Krentz says, you have to remember, this case didn't start out being about tracing. This was a breach of contract case. And what Judge Krentz found in the initial complaint was that, A, NTP hadn't identified anything that could be considered a trade secret, and, B, that any trade secret would have been owned by Cap Logistics by virtue of the services agreement. So to get around that, what NTP said was, well, we have this process for assembling components that predates the services agreement. And Judge Krentz said, well, if that's the case, then if you can prove that allegation, then you can proceed. But it's in the proving of that allegation where NTPs come up short, where the general principles come up short, and where they haven't provided any evidence whatsoever of any other process. So for all those reasons, I ask that this Court affirm the judgment of this case. Thank you. Mr. Jordan, rebuttal. Thank you. Just a few points. I forgot to mention, it wasn't that they just objected to them sending people into the area. Remember that Mike Gunyer actually was barred from the facility for asserting what he thought were the contractual rights. So at that point, when they saw that they had thrown a guy out of the facility, I don't know what more, other than going to court, for sure, but what more can they do trying to continue on with this relationship? I think that you have to keep that in mind when looking at the e-mails and things about turning over the documents, and they didn't turn over everything. I'm curious. Why wouldn't NTP retain copies of the bill books in their own headquarters if they were trade secrets? Doesn't that make sense? This is not Caterpillar. They are not a sophisticated, huge corporation. This is a family-owned business. They had things printed out. The law applies equally to all businesses, whether you're a huge corporation or a small family-owned business. But here, actually not so. When you're talking about what steps are taken to keep these things secret, the law actually says you look at small corporations differently than large corporations when you're trying to decide do they take sufficient steps to keep their secrets secret. And I think that's certainly a point we made to the judge below when we cited that case in our brief. I agree with you normally, but in this case, they do take that into account when deciding do they take sufficient steps to keep their information secret. How do you respond to counsel's argument that there really was no evidence that these bill books were modified, that rather new ones had to be created, and they were created after entering into the service agreements? I think if you look at A13 in our brief, which is paragraph 25 of Michael Garnier's affidavit, he says specifically when talking about the post-2014 assembly materials, the process did not change. The minor changes that NTP made to the bill books and assembly aids after 2004 were simply updates to the original documents that NTP had created long before the services agreements were in effect. So when we say that there were just the minimum changes after 2004, the process didn't change, relying upon Mr. Garnier's affidavit. And I think there's also mention of that, too, in our interrogatory answers. In describing the pattern of process, I'd ask you to look at A24 through A27, which is our interrogatory answer to number 4, which asks us to identify and fully describe your pattern of process. We have a three-page response to that. Again, this is not a patterned process, a patented process, I should say. It's not a patented process. It's not highly technical, but none of that matters under the ACTS definition of what constitutes a trade secret. It can be non-technical data. Information can qualify. They argue when identifying the patterns of processes, I mean, basically the identification was that you took it from a situation where all the parts were brought to one area and the whole thing was put together to assembling smaller parts in different areas and then moving it along, which isn't the definition of an assembly line. I think the way I've described it below, Judge, and the way I picture it in my mind, I don't know if you know the kids that buy Legos. We did this last weekend with my son. Try building this with just the pieces. You can't do it. You have to know step-by-step instruction, and all this is is pictures of the pieces and what to do next. That's what these guys did. They took a radiator assembly. They figured out, okay, this is the first step, this is the second step, this is the third step, to make this more efficiently and cost-effectively than Caterpillar ever could. Remember, they were doing this work for decades for Caterpillar. So for decades, Caterpillar was paying them more money than their own workers because they could do it better. It ended up being a net benefit to Caterpillar to be paying the higher labor costs because at the end of the day, they got more of these assembly pieces, components, quicker and better productive than their own workers. So the workers, the unskilled labor that they would use, had to have some way to do this, and that's what they did. They figured out, okay, this is the best way to do this. Let's put these materials together so that anybody off the street that we hire can just follow along and do it. That's what they did here. So again, under the Trade Secret Act's definition, that's enough for it to qualify as a trade secret. It isn't. Yes, they had an assembly line, and they thought about quality effectiveness and efficiency and general principles, but what they actually did was turn Caterpillar's system of doing it into a cost-effective, better way to do it, the NTP way. Thank you, Your Honor. Thank you. The Court thanks both parties for the quality of your arguments today. The case will be taken under advisement. A written decision will be issued into force. The Court stands in recess.